UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **RENEE R. GREEN,**<br><br>   **Plaintiff,**<br><br> v.<br><br>**CAROLYN W. COLVIN,**<br>**ACTING COMMISSIONER OF SOCIAL**<br>**SECURITY,**<br><br>   **Defendant.** | Civ. No. 2:13-03463 (WJM)<br><br>**OPINION** |

**WILLIAM J. MARTINI, U.S.D.J.:**

  Plaintiff Renee R. Green, a 52 year-old former post office clerk suffering from "excruciating" back pain and spinal problems substantial enough to necessitate a microdiskectomy procedure, brings this action pursuant to 42 U.S.C. §§ 405(g), seeking review of a final determination by the Commissioner of Social Security (the "Commissioner") concluding that Green was not under a disability from October 16, 2007 through the present, and denying Green's application for Social Security Disability ("SSD") Benefits and Supplemental Security Income ("SSI") Benefits. For the reasons that follow, the Commissioner's decision is **AFFIRMED**.

**I. BACKGROUND**

  This section contains four parts. First, the Court considers the medical record, which establishes substantial medical problems dating back to 2007. The Court also considers functional capacity reports written by Green's treating physician, Dr. Mehta. Second, the Court summarizes Green's reports about her daily activities. Third, the Court discusses the reports of non-treating state agency medical consultants who reviewed Green's file. Fourth, and finally, the Court describes the testimony of a vocational expert who addressed the availability of various jobs in the national economy.

1

### A.     Medical Record and Reports of Treating Physician Dr. Mehta

Since 2007, Green has received treatment from Dr. Monica Mehta of Christ Hospital. Dr. Mehta is board certified in physical medicine and rehabilitation.

#### 1.     2007

On November 5, 2007, Dr. Mehta ordered an MRI of Green's left knee.  The MRI revealed mild degenerative changes seen at the lateral patellofemoral compartment and medial compartment, mild thinning of the cartilage, and possible evidence of bursitis or trauma.  Tr. at 327-28, ECF No. 5.

#### 2.     2008

On February 7, 2008, a cervical spine MRI ordered by Dr. Mehta showed mild degenerative disc disease and several bulging discs. *Id.* at 326.
Some ten months later, on December 8, 2008, Green reported to the emergency room complaining of back pain. *Id.* at 491.  Doctors diagnosed chronic back pain and wrote prescriptions for Percocet and Valium. *Id.* at 491.

#### 3.     2009

On February 27, 2009, Green again reported to the emergency room, this time complaining of shoulder pain. *Id.* at 230.  Green stated that she ran out of her pain medication and would not be seeing her doctor until the following week. *Id.*  An examination revealed diffuse tenderness of the paralumbar area and mild spasm, and Green was put in a shoulder sling. *Id.*  Green was diagnosed with back pain and shoulder tendinitis. *Id.* at 231.
On June 13, 2009, Green returned to the emergency room complaining of back pain, and she was given Percocet. *Id.* at 468-69.  An MRI roughly one week later revealed cervical spondylosis with small posterior osteophyte bulge complexes at C3-4 through C6-7. *Id.* at 394.
On May 2, 2009, Green again ran out of her pain medication and again sought treatment in the emergency room, this time for back pain. *Id.* at 258-59.  Green was given a prescription for OxyContin and Percocet. *Id.* at 259. On June 13, 2009, Green reported to the emergency room, again complaining of back pain. *Id.* at 265.

On October 16, 2009, an MRI ordered by Dr. Mehta revealed a "large right paracentral to lateralizing disc herniation [at L5-S1] generating a large protrusion resulting in severe right S-1 nerve root and compression and right ventral thecal sac compression." *Id.* at 321. Another MRI taken two weeks later revealed mild bulging annuli at C3-4 through C6-7. *Id.* at 317.

### 4.  2010

On February 19, 2010, Green presented to Dr. Mehta complaining of neck pain radiating to the extremities. *Id.* at 314. Green reported that her pain level was 10/10. *Id.* Dr. Mehta noted that various MRI scans indicated degenerative changes and bulging discs at C3/C4, C4/C5, and C5/C6, as well as the presence of a small joint knee effusion with chondromalacia. *Id.* That same day, Dr. Mehta wrote a letter to the Social Security Administration describing the visit (the "February 19, 2010 Letter"), and more generally, Green's medical issues. *Id.* at 314-16. It was Dr. Mehta's opinion that Green was totally disabled from any gainful employment. *Id.* at 316.

Later that same year, on October 10, 2010, Green again reported to the emergency room complaining of lower back pain. *Id.* at 366. An examination revealed diffuse tenderness of the paralumbar area and mild spasm, and Green was given Toradol and Valium. *Id.* at 367.

### 5.  2011

In early 2011, Green was back in the emergency room complaining of back pain. *Id.* at 477-78. On March 23, 2011, an MRI revealed a large disc herniation at L5-S1 superimposed on degenerative disc disease. *Id.* at 401. MRIs taken in May 2011 revealed a tendon degeneration or partial tear in Green's left knee, as well as a horizontal tear of the right meniscus in Green's right knee. *Id.* at 395-98.

On August 17, 2011, Dr. Mehta examined Green. *Id.* at 454. Dr. Mehta found limited motion in all directions of the lumbar spine and limited lateral flexion of both knees. *Id.*

On August 18, 2011, Dr. Mehta noted in a letter (presumably written to the Social Security Administration) that she reiterated the findings she made in the February 19, 2010 Letter. *Id.* at 388-391. Dr. Mehta stated that a surgeon recommended a microdiskectomy procedure of the lumbar spine, but Ms. Green's insurance would not cover it. *Id.* at 390. Dr. Mehta expressed the view that Green could not work because of her medical problems. *Id.* at 391.

3

6.     2012

On February 11, 2012, an MRI of Green's right knee showed a horizontal tear of the anterior horn lateral meniscus. *Id.* at 479. A March 6, 2012 MRI of Green's right wrist showed "abnormal morphology scapholunate ligament suspicious for tear, subchondral cyst ulnar aspect of the lunate likely degenerative, and mild intercarpal fluid." *Id.* at 487.

On March 12, 2012, Dr. Mehta completed a Multiple Impairment Questionnaire detailing Green's medical problems. *Id.* at 426-33. In the questionnaire, Dr. Mehta reported that Green suffered from cervical disc herniation, cervical radiculopathy, lumbar disc herniation, lumbar radiculopathy, facet arthropathy, bilateral knee derangement, and degeneration of the knees. *Id.* at 426. Dr. Mehta explained that Green's primary symptoms were: "unable to sit or walk . . . without pain." *Id.* Dr. Mehta rated Green's pain as 10/10. *Id.* at 428. Dr. Mehta rated Green's fatigue as a 9/10. *Id.* Dr. Mehta explained that Green could sit for 1 hour total and stand/walk for 0-1 hoursless than 1 hour total in an 8-hour workday. *Id.* at 428. Dr. Mehta explained that Green could occasionally lift and carry 0-5 pounds. *Id.* at 429. Finally, Dr. Mehta noted that Green was taking several medicines, including Percocet and Oxycodone. *Id.* at 430.

### B.     Green's Reports About Her Daily Activities

At a hearing held on March 21, 2012, Green gave testimony before Administrative Law Judge Dennis O'Leary (the "ALJ"). Green testified that she had previously worked at the United States Postal Service ("USPS") for a period of 15 years. *Id.* at 51. For the last 12 years of her time at the USPS, Green said that she worked as a window clerk. *Id.* Green testified that she stopped working at the USPS in October 2007 because her pain was too intense. *Id.* at 53. Green testified that she tried to go back to work in 2009, but she was only able to work for three days because of the pain. *Id.* at 55.

Green testified that since she stopped working in October 2007, her pain has been "excruciating." *Id.* at 56. Green testified that she can lift only about two pounds. *Id.* at 57. Green testified that she spends most of the day lying down in her bed or on the couch watching television. Green testified that when she sits she has to get up every 20 minutes. *Id.* at 60, 71. Green testified that she can stand for maybe 30 minutes. *Id.* at 61. As for housework, Green testified that she usually makes frozen dinners, that she does not clean, and that she does not go to the supermarket. *Id.* at 64-65. Additionally, Green testified that she is taking the painkillers Oxycontin and Percocet, as well as the

muscle relaxer Flexeril. *Id.* at 61-62. Green testified that she sees Dr. Mehta each week because Dr. Mehta "doesn't like giving medication long term." *Id.* at 70.

Besides from testifying about her daily activities, Green provided a function report dated March 22, 2010. *Id.* at 185-192. In the report, Green described her typical day: waking up, taking her medicine, brushing her teeth, eating breakfast, watching television, napping, having lunch, watching television, reading or listening to music, showering, eating dinner, and going to sleep. *Id.* at 185. Green stated that she also feeds her cat. *Id.* at 186. Green noted that she spends 5-10 minutes making a frozen dinner or ordering take-out. *Id.* at 187. She also stated that she could make her bed, do small laundry loads over the course of 30 minutes, and clean the sink. *Id.* at 187. She stated that she rides in a car once or twice per week, and that she spends 10 minutes every 2 or 3 weeks shopping, either by phone or computer. *Id.* at 188. Finally, she stated that she can walk "about a short block" before she has to stop and rest for a few minutes. *Id.* at 190. Green's function report was largely corroborated by a third-party report written by Green's friend, Anderson Kinsey. *Id.* at 193-200.

### C.     Opinions of State Medical Consultants

Besides from the reports of Dr. Mehta, the record contains reports from two state medical consultants, neither of whom treated Green. First, the record contains a physical residual functional capacity assessment completed by Zwi Kahanowicz, M.D. on June 23, 2010. *Id.* at 329-337. Dr. Kahanowicz found that Green could occasionally lift 20 pounds and frequently lift 10 pounds, that Green could stand at least 2 hours in an 8-hour workday, and that Green could sit (with normal breaks) for about 6 hours in an 8-hour workday. *Id.* at 330. Dr. Kahanowicz observed that Green is "independent in self care," that Green "perform[s] light daily activities," and that Green "get[s] around as needed." *Id.* at 331. Dr. Kahanowicz added that Green "[performs] a wide range of normal daily activities, which would have been grossly restricted if the objective findings had been permanent like Lower Back, Shoulder, Knees (credibility!?)." *Id.* In issuing his opinion, Dr. Kahanowicz indicated that he did not have access to a "treating or examining source's statement regarding the claimant's physical capacities." *Id.* at 336.

Second, the record contains a case analysis from Ibrahim Housri dated January 25, 2011. *Id.* at 383. Because the "TP [treating physician] and attorney failed to provide any new information," Housri affirmed the conclusions in Dr. Kahanowicz's June 23, 2010 report. *Id.*

### D. Testimony of the Vocational Expert

During the March 21, 2012 hearing, the ALJ took testimony from a vocational expert ("VE"). The ALJ asked the VE to evaluate four hypotheticals.

First, the ALJ asked the VE to consider someone with Green's age, education, and work history, who could perform light work but would be restricted from lifting the right upper extremity above the parallel and would be precluded from lifting more than 10 pounds with the right upper extremity. *Id.* at 73. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Light work "requires a good deal of walking or standing." *Id.* The VE stated that the person described by the ALJ could perform the work of a mail clerk. *Id.* at 74.

Second, the ALJ asked the VE to consider the same person from the first hypothetical but to change the work tolerance from light work to sedentary work. "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(c). "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." *Id.* The VE stated that the person described in the ALJ's hypothetical could not work as a mail clerk but could work as an order clerk, food and beverage. *Id.* at 75. The ALJ stated that there are 16,000 such jobs available in the national economy. *Id.*

Third, the ALJ asked the VE to consider someone with Green's age, education, and work history, who could perform work at the sedentary level, who was unable to lift the right upper extremity above the parallel, who was unable to lift more than 10 pounds with the right upper extremity, and who was restricted to occasional fine finger manipulation with the right upper extremity. *Id.* at 75-76. The VE testified that there were no available jobs that such a person could perform. *Id.* at 76.

Fourth, and finally, the ALJ asked the VE to consider the same person from the third hypothetical but to change the work tolerance from sedentary work to light work. *Id.* at 76. The VE testified that there were no available jobs in the national economy that such an individual could perform. *Id.* at 77.

## II. LEGAL STANDARDS

### A. The Five-Step Sequential Analysis

Under the authority of the Social Security Act, the Social Security Administration has established a five-step evaluation process for determining whether a claimant is entitled to benefits. 20 C.F.R. §§ 404.1520, 416.920. At step one, the Commissioner determines whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. *Id.* § 404.1520(b), 416.920(b). If not, the Commissioner moves to step two to determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id.* §§ 404.1520(c), 416.920(c). If the claimant has a severe impairment, the Commissioner inquires in step three as to whether the impairment meets or equals the criteria of any impairment found in the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1, Part A ("Part A"). If so, the claimant is automatically eligible to receive benefits (and the analysis ends); if not, the Commissioner moves on to step four. *Id.* §§ 404.1520(d), 416.920(d). At step four, the Commissioner decides whether, despite any severe impairment, the claimant retains the RFC to perform past relevant work. *Id.* §§ 404.1520(e)-(f), 416.920(e)-(f). The claimant bears the burden of proof at each of these first four steps. At step five, the burden shifts to the Social Security Administration to demonstrate that the claimant is capable of performing other jobs that exist in significant numbers in the national economy in light of the claimant's age, education, work experience and RFC. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91-92 (3d Cir. 2007) (citations omitted).

### B. Standard of Review

For purposes of this appeal, the court's review of legal issues is plenary. *See Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 431 (3d Cir. 1999). The ALJ's factual findings are reviewed "only to determine whether the administrative record contains substantial evidence supporting the findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). Substantial evidence is "less than a preponderance of the evidence but more than a mere scintilla." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citation omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* When substantial evidence supports the ALJ's factual findings, this Court must abide by the ALJ's determinations. *See id.* (citing 42 U.S.C. § 405(g)).

The substantial evidence standard is highly deferential. "If a limitation is medically supported but is also contradicted by other evidence, the ALJ can choose to credit portions of the existing evidence and disregard others." *Seabon v. Comm'r of Soc. Sec. Admin.*, No. 10-2268, 2011 WL 3425508, at *8 (D.N.J. Aug. 4, 2011). "The ALJ cannot, however, 'reject evidence for no reason or for the wrong reason.'" *Id.* (internal citation omitted).

In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider the entire record. *Reefer v. Barnhart,* 326 F.3d 376, 379 (3d Cir. 2003). "The court must give deference to the administrative findings and may not 'weigh the evidence or substitute its conclusions for those of the fact-finder.'" *Allen v. Comm'r of Social Sec.*, No. 10-2614, 2011 WL 1321985, at *7 (D.N.J. 2011) (internal citation omitted).

### III.   THE ALJ'S DECISION

At step one, the ALJ found that Green had not engaged in substantial gainful activity since October 16, 2007, the alleged onset date of Green's disability. Tr. at 35. At step two, the ALJ found that Green had the following severe impairments: spinal disc disease, knee impairment, and right shoulder tendinitis. *Id.* At step three, the ALJ found that Green's impairments, alone and in combination, did not meet or equal any of the impairments listed in Part A. *Id.* at 36. At step four, the ALJ found that Green could not perform her past work as a postal clerk but could perform sedentary work that would not require her to lift her right arm above her shoulder. *Id.* at 36-39. (As noted earlier, sedentary work involves lifting up to 10 pounds and involves sitting and a certain amount of walking and standing. *See* 20 C.F.R. § 404.1567 (a)). Here, the ALJ noted that "[w]hile it is reasonable to find that the claimant [Green] does have pain in multiple joints and spine, the evidence does not establish that the level of pain is so debilitating as to preclude all work activity." *Id.* at 38. In reaching this decision, the ALJ gave "little weight" to Dr. Mehta's opinion that Green could sit for 1 hour in an 8-hour workday, that Green could stand/walk for up to 1 hour in an 8-hour workday, and that Green could lift 5 pounds occasionally. *Id.* at 38. The ALJ explained:

> I give little weigh to this opinion as it is inconsistent with objective evidence including Dr. Mehta's treatment records. A careful review of treatment records indicate that the claimant has pain and associated limitation of motion of the cervical and lumbosacral aspects of the spine. Diagnostic evidence does show a disc herniation in the lumbosacral spine

8

> with neural foraminal. The cervical spine show disc bulging but no herniation or other abnormality. The claimant's right knee showed mild degenerative changes and a more recent MRI showed a tear in the meniscus, [but] the left knee was normal. There is no diagnostic evidence of right shoulder abnormalities or any diagnostic evidence of right wrist/finger abnormalities. Dr. Mehta's assessment not allowing for more than one hour of sitting and not more than one hour of walking/standing in an 8-hour workday is not borne out by the objective evidence or even the claimant's own reporting of daily activities. This assessment does not provide for a reasonable assessment of claimant's functional capabilities.

*Id.* at 38. The ALJ went on to attribute significant weight to the conclusions of the state medical consultants, who found that Green could stand and walk at least 2 hours in an 8-hour workday, that Green could sit for about 6 hours in an 8-hour workday, and that Green could lift and carry 10 pounds frequently and 20 pounds occasionally. *Id.* at 38. The ALJ stated that the conclusions of the consultants were consistent with the objective evidence. *Id.* at 38-39. Also, the ALJ concluded that while Green's impairments could "reasonably be expected to cause the alleged symptoms . . . the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with [the ALJ's] residual functional capacity assessment." *Id.* at 37.

At step five, the ALJ found that Green was not disabled because she could perform the work of an order clerk, food and beverage, and because that job existed in significant numbers in the national economy. *Id.* at 39-40.

## IV.   DISCUSSION

Green challenges the ALJ's step four finding on two grounds. First, Green argues that the ALJ disregarded the "treating physician rule" when he gave little weight to Dr. Mehta's opinions and substantial weight to the opinions of the non-treating consultants. Second, Green argues that the ALJ improperly evaluated Green's credibility. Both arguments fail.

### A.   The ALJ Properly Applied the Treating Physician Rule.

The treating physician rule is a "cardinal principle guiding disability eligibility determinations." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (internal quotations

9

and citations omitted). Under the treating physician rule, ALJs must generally "accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Id.* However, "[w]here . . . the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason." *Id.* (internal quotations and citations omitted). "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Id.* (internal quotations and citations omitted).

      Here, the ALJ gave Dr. Mehta's opinion "little weight" because it was "inconsistent with objective evidence." The Court finds that this decision was supported by substantial evidence, in the form of the medical record and Green's reports about her activities of daily living. While Green had several medical issues, her most serious medical issue was an L5-S1 disc herniation. The ALJ was well within his discretion to conclude that this medical evidence did not support a claim of total disability. This is especially so when one considers that Green can walk and do light household chores.

      Green argues that the ALJ's decision to give more weight to the state medical consultants than Dr. Mehta was not supported by substantial evidence because the ALJ failed to consider the following factors: the examining relationship, the treatment relationship, supportability, consistency, and specialization." Pl.'s Br. at 12, 16 (citing 20 C.F.R. § 404.1527(c)(2)-(6) and § 416.927(c)(2)-(6)), ECF No. 13-3463. Moreover, Green argues that the ALJ failed to accompany his discussion of these factors with a "clear and satisfactory explication of the basis on which they rest." *Id.* (quoting *Buckley v. Astrue*, No. 9-5058, 201 WL 3035746, at *9 (D.N.J. Aug. 3, 2010)). The Court is not persuaded by these arguments. To begin, the ALJ recognized that Dr. Mehta is a specialist in physical medicine and rehabilitation. Tr. at 38. And while the ALJ did not explicitly reference the treating and examining relationship, it is clear that he considered it and that he determined that it did not trump the objective medical evidence. *Id.* at 37-39. Finally, as discussed earlier, the ALJ addressed whether Dr. Mehta's opinion was consistent with and supported by the record evidence.

      Next, Green argues that "the Third Circuit has repeatedly warned ALJs that they should not rely on opinions from non-examining sources alone when there is well-supported contradictory evidence in the record, as is the case here." Pl.'s Br. at 14. As discussed earlier, the record does not contain <u>well-supported</u> evidence contradicting the opinions of the non-examining medical consultants.

Accordingly, the Court finds that the ALJ properly applied the treating physician rule. The Court finds that substantial evidence in the record supports the ALJ's decision to give substantial weight to the opinions of the non-examining medical consultants.

### B. The ALJ Properly Evaluated Green's Credibility.

Green argues that the ALJ failed to properly evaluate her credibility. The Court disagrees.

When assessing a plaintiff's credibility, the ALJ should consider the objective medical evidence, as well as seven additional factors. Social Security Ruling ("SSR") 96–7p, 1996 WL 374186, at *3. Those factors are (i) the extent of daily activities, (ii) the location, duration, frequency, and intensity of pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness, and side effects of any medication, (v) treatment other than medication for the symptoms, (vi) measures used to relieve pain or other symptoms, and (vii) other factors concerning functional limitations and restrictions due to pain or other symptoms. *See id.*; 20 C.F.R. §§ 404.1529, 416.929. SSR 96–7P does not mandate an exhaustive recitation of each of the seven pain factors, but rather requires that the ALJ "consider" all of these factors in making his determination. See *Canales v. Barnhart*, 308 F. Supp. 2d 523, 527 (2004).

Here, the ALJ acknowledged that Green has severe impairments, including spinal disc disease. However, the ALJ founded that while Green's impairments could "reasonably be expected to cause the alleged symptoms . . . the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with [the ALJ's] residual functional capacity assessment." Tr. at 37. In reaching this conclusion, the ALJ explicitly considered the objective medical evidence, the extent of Green's activities, and the medicines Green takes. *Id.* at 37-39. Green fails to identify any evidence in the record concerning (a) treatment other than medication for her symptoms, and (b) measures used to relieve her pain (besides from medication). Ultimately, the Court finds that the ALJ properly considered what he needed to in order to assess Green's credibility. The Court finds that the ALJ's credibility finding was supported by substantial evidence.

## V. CONCLUSION

For the foregoing reasons, the decision of the ALJ is **AFFIRMED**. An appropriate order follows.

/s/ William J. Martini
**WILLIAM J. MARTINI, U.S.D.J.**

**Date: June 30, 2014**